### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

CHARLES J. HUBERT
2720 NE 27th Street
Ocala, FL 34470

JEREMY I. SUNKEL
316 Chelsea Way
Oak Grove, KY 42262

       Plaintiffs,

   v.

UNITED STATES OF AMERICA,

DR. MARK T. ESPER, in his official capacity
as Secretary of Defense,
1000 Defense Pentagon
Washington, D.C. 20301-1000

RYAN D. MCCARTHY, in his official
capacity as United States Secretary of the
Army,
101 Army Pentagon
Washington, D.C. 20310-0101

JAMES E. MCPHERSON, in his official
capacity as Acting United States Secretary of
the Navy,
1000 Navy Pentagon
Washington, D.C. 20350-1000, and

PHYSICAL DISABILITY BOARD OF
REVIEW
3351 Celmers Lane
Joint Base Andrews, MD 20762

      Defendants.

Case No.:

## <u>COMPLAINT</u>

Plaintiffs Charles J. Hubert and Jeremy I. Sunkel, by and through their undersigned

attorneys, respectfully submit this Complaint seeking relief under the Administrative Procedure

Act ("APA"), 5 U.S.C. § 702, from the United States Army's ("Army") and the United States Navy's ("Navy") erroneous final determinations of their respective medical retirement benefits, and allege as follows.

## INTRODUCTION

1.      Plaintiffs are disabled combat veterans living with Post-Traumatic Stress Disorder ("PTSD") and other mental health related conditions resulting from their combat experiences.

2.      Plaintiffs' PTSD and other mental-health related symptoms resulted in the premature ending of their military careers when they were both determined unfit for continued service and medically separated from their respective branches with only 10 percent disability ratings and no further long-term benefits.

3.      After their separations, both Plaintiffs were evaluated by the Department of Veterans Affairs ("VA") and each received higher disability ratings warranting military medical retirement as opposed to separation.

4.      Plaintiffs sought administrative review by the Army and the Navy, respectively, of their medical retirement benefits. However, the Physical Disability Board of Review ("PDBR") failed to properly evaluate their eligibility for medical retirement status and improperly denied them the corresponding benefits.

5.      Plaintiffs bring this action under the APA to set aside the final decisions issued by the Army and the Navy that assessed Plaintiffs' respective eligibility to receive military medical retirement benefits. Specifically, Mr. Hubert seeks to set aside the Army's October 31, 2017 determination to accept the PDBR's recommendation regarding his medical retirement. ("Hubert Final Decision"). Likewise, Mr. Sunkel seeks to set aside the Navy's February 28, 2018

2

determination to accept the PDBR's recommendation regarding his medical retirement. ("Sunkel Final Decision") (collectively the "Final Decisions").

6. The Army and the Navy's Final Decisions to accept the recommendations of the PDBR panels were arbitrary, capricious, and contrary to law and regulation.

7. The Army and Navy uncritically accepted the erroneous recommendations of the PDBR that each Plaintiff should be constructively placed on the military's temporary disability retired list ("TDRL") with a 50 percent disability for six months and then removed with only a 10 percent permanent disability rating thereafter.

8. In so doing, the Army and Navy failed to implement the protections provided by 38 C.F.R. § 4.129 and 10 U.S.C. §§ 1210(a) & 1210(b) that are designed to protect veterans such as Plaintiffs. *See U.S. Dep't of Def., Policy Memorandum on Implementing Disability-Related Provisions of the National Defense Authorization Act (NDAA) of 2008* (Pub L. 110-181) (2008). These laws require the Army and Navy to place a service member diagnosed with PTSD on the TDRL, and together with 38 C.F.R. § 4.129 to provide each Plaintiff here with an initial disability rating of at least 50 percent for at least six months, and to then make a decision on the permanency of the condition within five years of separation. Further, the Army and Navy may only make a permanent rating decision after the respective branch has conducted an appropriate post-discharge medical examination. Moreover, once the military branch issues a proposed permanent rating, the above-cited laws and regulations require that a service member being removed from the TDRL be provided with a hearing to contest removal or seek a higher permanent rating.

9. Plaintiffs never received the required post-discharge medical examinations. In addition the Army and Navy never afforded the veterans a hearing within the requisite five year time period. Therefore the Army's and Navy's determinations to adopt the PDBR

3

recommendations to constructively remove Plaintiffs from the TDRL after six months and to assign a 10 percent permanent disability rating were contrary to law.

10.     At this point, the time period for conducting the required medical examinations and hearings has expired.  Thus, this aspect of the Army's and Navy's failures with respect to Plaintiffs cannot be cured.  Plaintiffs, therefore, are entitled to constructive placement on the TDRL for the statutory maximum period of five years from the date of their initial placements, and then permanent retirement at the last properly assigned disability rating, which for both was 50 percent as required by 38 C.F.R. § 4.129.

11.     The failures by the Army, Navy, and the PDBR to follow applicable laws and regulations have deprived Plaintiffs of the medical retirement status and benefits to which they are entitled.  This deprivation includes the loss of a host of substantial non-monetary benefits that Plaintiffs earned through their honorable service and which would be available to them if they held retiree status.  A medical retiree is entitled to military health care (TRICARE) for themselves, their spouse, and their minor children. A medical retiree is also entitled to access to military bases, commissary privileges, and the right to wear his or her uniform on appropriate public occasions, travel on military aircraft, military funeral arrangements, and burial privileges in national cemeteries.

12.     Plaintiffs have elected to pursue their claims jointly in order to bring attention to the fact that there is mounting evidence that the Army, Navy, and the PDBR continue to fail to apply the law as required. *See Cook v. United States*, 123 Fed. Cl. 277, 307-08 (2015); *Jason K. Sapp v. United States, et al*, Case No. 1:20-cv-00935, ECF No. 1.

## PARTIES

13.     Plaintiff Charles J. Hubert ("Hubert") is a citizen of the United States, a veteran of the Army and a resident of Belleview, Florida.

14.     Plaintiff Jeremy I. Sunkel ("Sunkel") is a citizen of the United States, a veteran of the Navy, and a resident of Oak Grove, Kentucky.

15.     Defendant Dr. Mark T. Esper is the United States Secretary of Defense.  Defendant Esper is the chief officer of the Department of Defense ("DoD") and exercises authority, direction and control over the DoD and the PDBR, which makes recommendations regarding veterans' disability status.   Secretary Esper's official duties are conducted at 1000 Defense Pentagon Washington, D.C. 20301-1000.

16.     Defendant Ryan D. McCarthy is the United States Secretary of the Army.  He is the chief officer of the Army and exercises authority, direction and control over the Army. Secretary McCarthy's official duties are conducted at 101 Army Pentagon, Washington, D.C. 20310-0101.

17.     Defendant James E. McPherson is the acting United States Secretary of the Navy. He is the chief officer of the Navy and exercises authority, direction, and control over the Navy. Acting Secretary McPherson's official duties are conducted at 1000 Navy Pentagon, Washington, D.C. 20350-1000.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case raises federal questions under the laws governing the military and under the APA. 10 U.S.C. § 1210; 5 U.S.C. § 702 *et seq.*

19.     Plaintiffs exclusively seek declaratory and other equitable relief.  *See* 5 U.S.C. § 702. Specifically, Plaintiffs seek orders setting aside the Army's and Navy's erroneous

determinations of their military disability retirement benefits and remanding their cases to the Army and Navy for resolution in accordance with law.

20.     The Army's and Navy's medical retirement status and benefit determinations constitute final agency actions for which there is no other adequate remedy.  *See* 5 U.S.C. § 704.

21.     Venue in this Court is proper under 28 U.S.C. § 1391(e)(1) because multiple Defendants' principal offices are located in and their official duties are conducted within this judicial district. Venue is also proper under 5 U.S.C. § 703 because this is a Court of competent jurisdiction.

22.     In accordance with 28 U.S.C. § 2501, this action is brought within six years of the Final Decisions.

## LEGAL BACKGROUND

### The Army & Navy's Discharge Procedures

23.     Chapter 61 of Title 10 of the United States Code establishes the process through which all military departments may discharge disabled service members.  That chapter authorizes the discharge of military personnel who are found to be unfit for continued military service due to physical or mental health related disability.

24.     Fitness for duty and eligibility for medical retirement are governed by regulations set forth by the various military departments. 10 U.S.C. § 1216.

25.     The Army and Navy utilize similar procedures under their respective regulations for separating their personnel on the basis of disability. Both branches' procedures consist primarily of three phases:  evaluation by an Army or Navy Medical Examination Board ("MEB"), referral to a Physical Evaluation Board ("PEB"), and discharge. Department of Defense Instruction

("DoDI") 1332.38; Army Regulation 635-40 "Physical Evaluation for Retention, Retirement, or Separation" (Feb. 8, 2006) (hereinafter "Army Regulation 635-40"); Sec. of Navy inst. 1850.4e.

26.     For each, the process begins with referral to an MEB.  DoDI 1332.38; Army Regulation 635-40 ¶ 4-9; Navy Disability Evaluation System Manual ("NDESM") Ch. 3 *et seq.* The MEB documents a service member's medical symptoms and duty limitations and makes preliminary recommendations as to whether he or she meets the Army or Navy's retention standards. Army Regulation 635-40 ¶ 4-10; NDESM Ch. 3 *et seq.* If the MEB determines that the service member has one or more physical or mental conditions that fall below retention standards, it refers the service member to a PEB for an ultimate fitness determination. DoDI 1332.38, E4.A1.1.2.11.4; Army Regulation 635-40 ¶¶ 4-10, 4-13(a); NDESM Ch. 1. § 2(b).

27.     The PEB is responsible for determining the fitness of a service member's medical conditions, finding those condition unfit when they leave the service member unable to reasonably perform the duties of his or her office, grade, rank or rating.  *See* 10 U.S.C. § 1214 and DoDI 1332.38, E3, P3.2.1.

28.     If the PEB finds a service member unfit for duty, it then must assign a disability rating ranging from 0 to 100 percent, in increments of 10 percent, for each unfitting condition.  *Id.*

29.      In assigning disability ratings, the military department is required to apply the Veterans Affairs Schedule for Rating Disabilities ("VASRD"), which provides standardized methodology for assigning a numeric disability rating.  *See* 10 U.S.C. § 1201, 1203, National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-118 § 1642(a), 122 Stat 465, codified at 10 U.S.C. § 1216a and 38 C.F.R. Part IV *et seq*.

30.     The PEB's disability rating controls the nature of military benefits and services provided to the service member after discharge.  *Id.*  The rating, when at least 30 percent, dictates

that a service member is "medically retired" with monthly disability retirement pay and other benefits, such as lifetime healthcare coverage and military commissary and exchange privileges; when below 30 percent, the service member is "medically separated" with a one-time lump sum severance payment and no additional benefits.  *See* 10 U.S.C. §§ 1201 and 1203.

31.     When a service member is awarded a 30 percent rating or above, the PEB then must decide whether the veteran's unfitting condition(s) are permanent and stable such that the veteran should be awarded a permanent retirement under 10 U.S.C. § 1201; or whether the veteran's unfitting condition(s) are unstable and likely to improve or worsen over the next five years such that the veteran should be placed on the TDRL pursuant to 10 U.S.C. § 1202.

32.     A service member placed on the TDRL is afforded certain additional procedural protections under 10 U.S.C. § 1210.  First, a service member on the TDRL must be given a physical examination at least once every 18 months to determine whether the disability for which he or she was temporarily retired has changed.  10 U.S.C. § 1210(a).  Second, the PEB must maintain a service member on the TDRL until the PEB decides, as a result of a periodic examination, the disability is of a permanent nature and stable. 10 U.S.C. § 1210(b).  Third, once the PEB decides that a disability is permanent and stable, it must provide a proposed final disability rating that will result in the service member's permanent retirement or medical separation.  10 U.S.C. §§ 1210(c)-(f).  Finally, a service member can only be removed from the TDRL once another formal PEB is convened where the service member can argue for an increased rating or against the stability and permanency of his or her condition.  10 U.S.C. § 1210(b).  Alternatively, if the military department does not provide periodic examinations, or convene a formal PEB or issue a final determination regarding the permanency of their disability within five years, the service member is entitled to be

placed on the permanent disability retirement list with the same disability rating they received on the TDRL.  *Id.*

### Congress Seeks to Harmonize Military and VA PTSD Determinations

33.    PTSD is a mental health disorder that can develop after an individual experiences, witnesses, or undergoes a traumatic event, often one that causes or threatens grave physical harm or death to that person or others involved in the incident.  According to the VA, between 11 and 20 percent of veterans who served in Iraq or Afghanistan during Operations Iraqi Freedom and Enduring Freedom have been diagnosed with PTSD.  U.S. Dept. of Veterans Affairs, "PTSD: National Center for PTSD," (available at: https://www.ptsd.va.gov/understand/common/ common_veterans.asp.).  Service members may suffer crippling flashbacks that cause them to replay the traumatic event or events; others may tend to avoid places, people, or other things that may remind them of the triggering event.  *Id.*  Many may experience trouble controlling emotions and exhibit abnormal irritability or anger to those around them.  *Id.*  A veteran living with PTSD may face daunting obstacles as a result of this injury, including but not limited to: difficulty readjusting to work or maintaining employment; difficulty interacting with others; feelings of estrangement or detachment; nightmares and sleep deprivation; impaired functioning; occupational instability; memory disturbances; and family, parenting or marital discord.  *Id.*

34.    In January 2008, Congress enacted the Dignified Treatment of Wounded Warriors Act of 2008 ("DTWWA"), which required the DoD to establish the PDBR, to review the combined disability ratings of medically separated veterans.  10 U.S.C. § 1554a(a)(1).  The PDBR is a joint service military review board responsible for reviewing the appeals of veterans who challenge their disability ratings and for making recommendations to military departments concerning those ratings.

35.     The PDBR is intended to address concerns that military departments were not accurately and consistently assigning disability ratings through the PEB and MEB processes, especially in comparison with the VA processes.  During a 2007 joint congressional hearing, the Chairman of the Veterans' Disability Benefits Commission ("VDBC") testified about discrepancies between disability ratings assigned by military departments and disability ratings assigned by the VA.  *See* Hearing on VA and DOD Collaboration: Report of the President's Comm'n on Care for America's Returning Wounded Warriors; Report of the Veterans Disability Benefits Comm'n: Hearing Before the S. Comm. on Veterans Affairs, 110th Cong. 62 (2007) (statement of James Terry Scott, LTG, USA (Ret), Chairman, Veterans' Disability Benefits Comm'n).  The Chairman cited the results of a study which concluded that, compared to the VA, military departments frequently assigned lower disability ratings for the same service member and the same medical conditions, even while using the same disability rating criteria (the VASRD).  The Chairman further testified that it is "apparent that DOD has strong incentive to assign ratings less than 30 percent so that only separation pay is required and continuing family health care is not provided."  *Id.*

### Statutory & Regulatory Background

36.     Following the enactment of the DTWWA, the DoD issued its Instruction  6040.44, which created the PDBR and its governing policies.  DoDI 6040.44 lists the four types of recommendations the PDBR can make to the Army and Navy.  The PDBR may recommend: (1) to affirm the veteran's separation, (2) to re-characterize the veteran's separation, (3) to modify the disability rating, and/or (4) to propose a new disability rating be issued.  *Id.*  The Army or Navy can then issue a Final Decision, which may modify or accept the recommendations of the PDBR. *Id.*  Generally, when the service branch accepts the PDBR's recommendation—as the Army and

Navy did in Hubert's and Sunkel's cases—the PDBR's recommendation contains the only substantive discussion of the evidence and the law.

37.    When examining the evidence, the PDBR is limited to reviewing the determinations of the PEB based on the evidence the PEB had, and the PDBR must apply the VASRD along with all applicable statutes in effect at the time of the contested separation.  DoDI 6040.44, Enclosure 3, § 3e.

38.    The Office of the Secretary of Defense has further expressly clarified that the PDBR is to apply VASRD § 4.129 to all service members found unfit for continued service after September 11, 2001 due to PTSD.  *See* Office of the Under Secretary of Defense for Personnel and Readiness, Memorandum for Secretary of the Army et al., "Requests for Correction of Military Records Relating to Disability Ratings for Post-Traumatic Stress Disorder" (July 17, 2009).   In such cases, where a grant of relief is appropriate, the PDBR is to assign a disability rating of not less than 50 percent for an initial period of six months following separation, with subsequent fitness determinations and disability ratings to be based on applicable evidence.  *Id*

## FACTUAL ALLEGATIONS

### Charles Hubert's Military Service

39.    Hubert served on active duty in the Army from May 12, 1992, to July 19, 1995 and from March 2, 2000, to January 18, 2005.  During his service he was deployed in combat roles in Somalia, Haiti, Panama, Bosnia, and Iraq.

40.    His first deployment was to Somalia, when he was 20 years old.  In Somalia, Hubert experienced combat as a mortar man and was awarded the Infantry Combat Badge. During the deployment, one of his close friends was killed in combat.

11

41.     Later, during his second term of active duty, he served as a UH-60 Blackhawk Helicopter crew chief in Iraq.  In this role, he participated in numerous combat medical evacuation missions, evacuating wounded military personnel.

42.     During a combat medical evacuation mission Hubert's aircraft came under heavy enemy fire.  Hubert further witnessed one of the AH-64 Apache Helicopters escorting his medevac aircraft being shot down.

43.     Throughout his military career Hubert received numerous commendations and service awards including an Air Medal, an Army Commendation Medal, an Army Achievement Medal and, and as mentioned above, the Combat Infantryman Badge.

**Charles Hubert's Medical History & Discharge**

44.     Not long after Hubert's combat deployment in Iraq, he began experiencing mental health related symptoms.  This included episodes of severe anxiety, panic, rapid heartbeat, rapid breathing, tremors and intense fearfulness.  Hubert's condition continued to deteriorate, and he began experiencing constant feelings of hypervigilance, intense anger, and unjustifiable fear of going into unfamiliar buildings.  These symptoms had a substantial impact on his professional, family, and social life, and he was subsequently diagnosed with PTSD.

45.     As a result of the duty limitations imposed by his PTSD, Hubert was referred to the Army's Disability Evaluation System process and on October 6, 2004.  An Army MEB documented that Hubert was experiencing PTSD along with other mental health related symptoms and found that his PTSD failed medical retention standards such that he should be referred to the PEB.

46.     On October 18, 2004, Hubert's case was referred to the PEB, where he was found unfit for continued service as a result of his PTSD.  The PEB assigned only a 10 percent disability rating.

47.     On January 18, 2005, Hubert was honorably discharged with a disability separation and severance payment from the Army.

### Charles Hubert's VA Compensation & Pension Examinations

48.     Shortly before he was discharged from the Army, Hubert filed a disability claim with the VA.  He then attended a Compensation and Pension ("C&P") Examination on April 16, 2005 at a VA facility in Gainesville, Florida.

49.     The C&P Examination documented Hubert's continued symptoms of anxiety and depression.  Hubert explained at his examination that he did not feel capable of working because he was easily fatigued and experiencing frequent symptoms of irritability and anger.

50.     On June 17, 2005, the VA issued its own disability rating decision based on Hubert's in-service medical records and the C&P Examination.  The VA's decision connected Hubert's PTSD to his service and found that the degree of Hubert's symptoms, including flashbacks, impaired sleep, avoidance, impaired concentration, and social isolation were consistent with the VA Diagnostic Code's criteria for a 50 percent disability rating.

### Jeremy Sunkel's Military Service

51.     Sunkel served on active duty in the Navy from July 20, 1998, to July 19, 2006 as a surgical technologist.

52.     From February 2003 to May 2003, Sunkel was deployed to Iraq.

53.     During his deployment, he witnessed an enemy ambush and the killings of fellow military personnel, civilians, and enemy combatants by gunfire and mortar rounds.

**Jeremy Sunkel's Medical History & Discharge**

54.     Not long after he returned from his deployment to Iraq, Sunkel began exhibiting mental health related symptoms such as sadness, irritability, lack of pleasure, decreased energy, poor concentration and mental slowness.  Sunkel further experienced an episode in which he experienced suicidal ideation for which he was hospitalized.  Thereafter he began receiving mental health treatment in November 2003.

55.     Despite the treatment for mental health and PTSD related symptoms while in the Navy, his condition worsened resulting in his placement on the Limited Duty list.

56.     Prior to his discharge and separation from the Navy, and after a year of being on limited duty, Sunkel was referred to the Navy Disability Evaluation System and he underwent an MEB examination which documented that he was experiencing severe depression, social isolation, psychomotor slowing and decreased concentration.  The MEB examiner's November 23, 2005 report concluded that Sunkel was experiencing major depression and recurrent, severe anxiety disorder, with PTSD-like features that was duty-limiting.  Sunkel was thereafter referred to a Navy PEB to determine whether he was fit to continue service.

57.      On April 6, 2006, a Navy PEB, relying on the MEB's report, found that Sunkel was unfit for further duty and determined that he should be medically separated with a 10 percent disability rating for his mental health related symptoms and PTSD.

58.     On July 19, 2006, Sunkel received an honorable discharge from the Navy.

**Jeremy Sunkel's VA Compensation & Pension Examinations**

59.     On April 10, 2006, prior to his separation from the Navy, Sunkel underwent a VA C&P Examination.  The VA C&P Examination further documented that he was experiencing

problems with sleep, nightmares, depression, anxiety, and loss of energy, poor concentration, irritability, and intrusive memories.

60.     On the basis of this examination, Sunkel's PTSD, and depression, Sunkel was assigned a 30 percent disability rating by the VA based on the VA's finding that he experienced moderate social impairment and mild work impairment.

## THE PDBR DECISIONS

### How the PDBR Recommended the Army and Navy Determine Hubert and Sunkel's Disability Retirement and Separation Benefits

61.     On September 12, 2016, Hubert submitted an application to the PDBR seeking review of the Army's decision to award a 10 percent permanent disability rating.  On October 11, 2017, the PDBR issued its recommendation, which recommended the Army constructively place Hubert on the TDRL for six months with a 50 percent disability rating, constructively remove Hubert from the TDRL at the six month mark (*i.e.,* July 18, 2005), and separate Hubert with a 10 percent permanent disability rating.

62.     On September 1, 2016, Sunkel submitted an application to the PDBR seeking review of the Navy's decision to award a 10 percent permanent disability rating.  On February 12, 2018, the PDBR issued its recommendation, which recommended that the Navy constructively place Sunkel on the TDRL for six months with a 50 percent disability rating, constructively remove Sunkel from the TDRL at the six month mark (*i.e.* January 19, 2007), and thereafter separate Sunkel with a 10 percent permanent disability rating.

63.     For both Hubert and Sunkel, the PDBR's written recommendations first canvassed their military service records, medical histories, and subsequent disability ratings issued by the VA.  In both instances the PDBR found that 38 C.F.R. § 4.129 should have been applied at discharge since PTSD, developed as a result of highly stressful combat service, directly brought

about their release from active military service, The PDBR thus recommended that Hubert and Sunkel be constructively placed on the TDRL post-separation with the minimum required disability rating for PTSD-related disability per 38 C.F.R. § 4.129 of 50 percent.

64.     However, the respective PDBR panels made the additional recommendations, without citing any legal authority for doing so, to constructively remove Hubert and Sunkel from the TDRL after only six months.  The PDBR panels further elected to use evidence from Hubert's and Sunkel's pre-discharge medical examinations and their VA C&P Examinations to recommend that the Army and Navy respectively assign them each a 10 percent permanent disability rating.

### How the PDBR *Should Have* Recommended the Army and Navy Determine Hubert and Sunkel's Disability Retirement and Separation Benefits under Applicable Law

65.     The PDBR correctly recommended that Hubert and Sunkel be constructively placed on the TDRL and given temporary 50 percent disability ratings pursuant to 38 C.F.R. § 4.129 effective as of the date of their separations from the Army and Navy.  However, as explained above and in *Cook*, 123 Fed. Cl. at 307, the recommendation for retroactive placement on the TDRL triggered certain statutory and regulatory procedural requirements.  These requirements include arranging one or more follow up physical examinations[1] and convening a new PEB (with all of its associated procedural protections) to determine a disability percentage and whether the disability for which the veteran was temporarily retired is permanent.  *Id.*; *see also* DoDI 1332.38; Army Regulation 365-40 ¶ 7-4 (2006) ("A Soldier on the TDRL must undergo a periodic medical examination *and PEB evaluation* at least once every 18 months to decide whether a change has

---

[1] 38 C.F.R. § 4.129 requires that the army "schedule an examination within the six month period following the veteran's discharge to determine whether a change in evaluation is warranted" and 10 U.S.C. § 1210(a) (1989) (amended 2017) requires "[a] physical examination be given at least once every 18 months . . . to determine whether there has been a change in the disability for which he was temporarily retired."

occurred in the disability for which the Soldier was temporarily retired.") (emphasis added); *see also* Army Regulation 365-40 ¶ 7-20(e)(1), (3) (providing that if the PEB recommends removing the service member from the TDRL, the service member is entitled to counseling from a PEB liaison officer and may also decide to waive or request a formal hearing); *see also* NDESM Ch. 1 § 4.1 (stating that initial follow-up medical examination should occur within 18 months of effective placement on the TDRL).

66.     Because Hubert and Sunkel were never actually placed on the TDRL, the Army and Navy never conducted the requisite post-discharge medical examinations of Hubert or Sunkel in order to determine when removal from the TDRL was appropriate or what permanent disability ratings were justified at that time.  Moreover, because the PDBR recommendations were issued more than ten years after Hubert and Sunkel's separations from the Army and Navy, the follow-up examinations and PEBs required by 38 C.F.R. § 4.129 could no longer be conducted in the required time periods.  *Cook*, 123 Fed. Cl. at 308 ("[The Army and Navy] cannot go back in time . . . to schedule a follow-up examination and convene a new PEB.  But the fact that it is impossible for the Army [or Navy] to schedule a follow-up examination and convene a new PEB within the time required by statute and/or regulation does not authorize the Army [or Navy] to disregard the statutory and regulatory requirements that govern the administration of the TDRL").

67.     As such, the PDBRs had no legal basis for their recommendations to remove Hubert and Sunkel from the TDRL after only six months, making their decisions to do so arbitrary, capricious, and unsupported by law.

68.     Accordingly, Hubert and Sunkel could not properly be removed from the TDRL after only six months, and the PDBR should have recommended that Hubert and Sunkel be

constructively retained on the TDRL with a 50 percent disability rating for the maximum period of five years as required by 10 U.S.C. § 1210(b).[2] *See Cook*, 123 Fed. Cl. at 308.

69.    Furthermore, it was arbitrary, capricious and contrary to law for the Army and Navy to adopt the PDBR's erroneous recommended permanent disability ratings based on Hubert's and Sunkel's pre-discharge medical examinations.  *Cook*, 123 Fed. Cl. at 308 ("[T]he Army [or Navy] could not have determined whether plaintiff's condition had changed based solely on the examination that preceded [their] discharge and . . . Allowing the Army [or Navy] to make a determination with such evidence . . . is, once again, tantamount to rewarding the Army [or Navy] for [their] own error.");  *id.* ("[T]he fact that the plaintiff underwent VA PTSD review examinations . . . is not sufficient to satisfy the statutory and regulatory requirements for two reasons.  First, the Army [or Navy] did not convene PEBs following the VA's examinations. Second, the PDBR is not empowered to sit as a PEB, it is only authorized to review the preexisting findings and decisions of a PEB.").  In short, the PDBR panels lacked appropriate support for their recommendations.

70.    Because Hubert's and Sunkel's five-year constructive placement on the TDRL expired without a single properly executed follow-up examination, a superseding disability rating determination or a properly conducted PEB, the PDBR panels only lawful option was to recommend that, upon their constructive removals from the TDRL, Hubert and Sunkel be

---

[2] 10 U.S.C. § 1210 provides:

>    (b) The Secretary concerned shall make a final determination of the case of each member whose name is on the temporary disability retired list upon the expiration of five years after the date when the member's name was placed on that list.  If, at the time of that determination, the physical disability for which the member's name was carried on the temporary disability retired list still exists, it shall be considered to be of a permanent nature and stable.

permanently retired with a 50 percent disability rating as required by 10 U.S.C. § 1210(c).[3] *See Cook*, 123 Fed. Cl. at 308.

71.     In sum, given the facts of Hubert's and Sunkel's cases, the Army and Navy should have taken the following three steps: (1) constructively place Hubert on the TDRL for five years with a 50 percent disability rating, (2) constructively remove Hubert from the TDRL after five years, and (3) then retire Hubert with a permanent disability rating of 50 percent.  This is exactly what the court in *Cook v. United States*, 123 Fed. Cl. at 308, ordered.

## COUNT I – ADMINISTRATIVE PROCEDURE ACT: Decision was Contrary to Law
### (5 U.S.C. § 706(2)(A))

72.     Plaintiff, Hubert, incorporates the allegations in paragraphs 1 through 71above.

73.     The Army's decision that Hubert should be constructively removed from the TDRL after only six months without the requisite periodic evaluations, a determination that his disability was stable for rating purposes at his removal or an opportunity for a final formal PEB was arbitrary, capricious and contrary to law.

74.     Federal law and regulation, 38 C.F.R. § 4.129 and 10 U.S.C. § 1210(a) & 1210(b), required the Army to constructively maintain Hubert on the TDRL for the maximum period of five years.

---

[3] 10 U.S.C. § 1210 provides:

> (c) If, as a result of a periodic examination under subsection (a), or upon a final determination under subsection (b), it is determined that the member's physical disability is of a permanent nature and stable and is at least 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination, his name shall be removed from the temporary disability retired list and he shall be retired under section 1201 or 1204 of this title, whichever applies.

75.     The Army's erroneous final decision has deprived Hubert of his military medical retirement benefits.

## COUNT II - ADMINISTRATIVE PROCEDURE ACT: Arbitrary & Capricious Decision
### (5 U.S.C. § 706(2)(A))

76.     Plaintiff, Hubert, incorporates the allegations in paragraphs 1 through 75 above.

77.     The Army's decision to assign Hubert a permanent disability rating of 10 percent upon removal from the TDRL on the basis of the PDBR's recommendation which relied on Hubert's pre-discharge medical examinations and the VA C&P Examinations was arbitrary, capricious, and contrary to law.  *Cook*, 123 Fed. Cl. at 307; *see also* 10 U.S.C. § 1210(a).

78.     Absent the required post-discharge evaluations and an opportunity for a formal PEB hearing, the Army lacked sufficient support for its initial disability rating.

79.     Moreover, since the PDBR is not empowered to sit as a PEB; the PDBR had no authority to review Hubert's 50 percent disability rating based on the VA C&P Examinations, because it cannot rely on facts not considered by the PEB.

80.     As such, the Army should not have accepted the PDBR's recommendation, and should have determined that Hubert was entitled to a permanent disability rating of 50 percent.  10 U.S.C. § 1554a(d)(3); *Cook*, 123 Fed. Cl. at 308.

81.     The Army's erroneous final decision has deprived Hubert of his military medical retirement and disability separation benefits.

## COUNT III – ADMINISTRATIVE PROCEDURE ACT: Decision was Contrary to Law
### (5 U.S.C. § 706(2)(A))

82.     Plaintiff, Sunkel, incorporates the allegations in paragraphs 1 through 81 above.

83.     The Navy's decision that Sunkel should be constructively removed from the TDRL after six months was contrary to law.  Federal law and regulation, 38 C.F.R. § 4.129 and 10 U.S.C.

§ 1210(a) & 1210(b), required the Navy to have constructively placed Sunkel on the TDRL for the maximum period of five years.

84.    The Navy's erroneous final decision has deprived Sunkel of his military medical retirement and disability separation benefits.

## COUNT IV – ADMINISTRATIVE PROCEDURE ACT: Arbitrary & Capricious Decision
### (5 U.S.C. § 706(2)(A))

85.    Plaintiff Sunkel incorporates the allegations in paragraphs 1 through 84 above.

86.    The Navy's decision to assign Sunkel a permanent disability rating of 10 percent on the basis of his pre-discharge medical examinations and the VA C&P Examinations was arbitrary, capricious, and contrary to law.  *Cook*, 123 Fed. Cl. at 307; *see also* 10 U.S.C. § 1210(a).

87.    Because the Navy never conducted a post-discharge medical examination of Sunkel, the Navy lacked sufficient evidence to support its determination.

88.    Moreover, the PDBR was not permitted to rely on the VA C&P Examination in order to review the disability rating because Sunkel's PEB did not consider it in making its disability rating determination.

89.    As such, the Navy should not have accepted the PDBR's recommendation, and should have determined that Sunkel was entitled to a permanent disability rating of 50 percent.  10 U.S.C. § 1554a(d)(3); *Cook*, 123 Fed. Cl. at 308.

90.    The Navy's erroneous final decision has deprived Sunkel of his military medical retirement and disability separation benefits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against the Defendants and award the following relief:

a. Find that the Army's decisions to constructively remove Hubert from the TDRL after six months and assign a 10 percent permanent disability rating were arbitrary, capricious, unsupported by substantial evidence and contrary to law;

b. Find that the Navy's decisions to constructively remove Sunkel from the TDRL after six months and assign a 10 percent permanent disability rating were arbitrary, capricious, unsupported by substantial evidence and contrary to law;

c. Remand the case to the respective to the PDBR to comply with law which requires the Army and Navy to constructively place Hubert and Sunkel on the TDRL for the maximum five-year period with a 50 percent temporary disability rating and to thereafter permanently retire Hubert and Sunkel with at least a 50 percent disability rating;

d. Award Plaintiffs costs and attorneys' fees; and

e. Grant any other and further relief that the Court deems just and proper.

**[SIGNATURE PAGE FOLLOWS]**

Dated: June 26, 2020                  Respectfully submitted,

                                      */s/ Nicholas S. Willingham*_____
                                      Nicholas S. Willingham, D.C. Bar #1656972
                                      nwillingham@sidley.com
                                      SIDLEY AUSTIN LLP
                                      1501 K Street NW
                                      Washington, D.C. 20005
                                      Telephone: (202) 736-8000

                                      Jaime L.M. Jones (*pro hac vice* application forthcoming)
                                      Ross O. Kloeber (*pro hac vice* application forthcoming)
                                      Jaime.jones@sidley.com
                                      rkloeber@sidley.com
                                      SIDLEY AUSTIN LLP
                                      One South Dearborn
                                      Chicago, IL 60603
                                      Telephone: (312) 853-7000


                                      Barton F. Stichman
                                      Rochelle Bobroff
                                      Esther Leibfarth
                                      bart@nvlsp.org
                                      rochelle@nvlsp.org
                                      esther@nvlsp.com
                                      NATIONAL VETERANS LEGAL SERVICES
                                      PROGRAM
                                      1600 K Street, N.W., Suite 500
                                      Washington D.C. 20006
                                      Telephone: (202) 621-5677
                                      Facsimile: (202) 328-0063

                                      *Counsel for Plaintiffs*